# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CA No. 1:11-CV-00161-JBS-AMD** |
| | ) | |
| **PURE EARTH RECYCLING, Inc. (f/k/a** | ) | |
| **Casie Ecology Oil Salvage, Inc. and** | ) | |
| **Mid-Atlantic Recycling Technologies, Inc.),** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## CONSENT DECREE

<u>TABLE OF CONTENTS</u>                                                          <u>Page</u>

I.      JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     APPLICABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     CIVIL PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.     STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        a.  Late Payment of Civil Penalty  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        b.  Failure to Comply with Certain Obligations of the Decree  . . . . . . . . . . . . . . . . . . . 13

VII.    INFORMATION COLLECTION AND RETENTION  . . . . . . . . . . . . . . . . . . . . . . . . 15

VIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS  . . . . . . . . . . . . . . . . . . . 17

IX.     COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

X.      NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

XI.     EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XII.    RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XIII.   MODIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XIV.    TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

XV.     PUBLIC PARTICIPATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

XVI.    SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

XVII.   INTEGRATION/APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

XVIII.  FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action ("the Complaint"), alleging that Defendant Pure Earth Recycling, Inc. ("PER" or "Settling Defendant") violated various provisions of the Subtitle C of the Solid Waste Disposal Act as amended, 42 U.S.C. § 6901, et seq., (hereinafter referred to as the Resource Conservation and Recovery Act ("RCRA") after a statutory amendment), its implementing regulations, authorized state regulations, and/or Settling Defendant's RCRA Permit.

In its Complaint, the United States includes allegations regarding the RCRA violations of Settling Defendant's predecessor corporations that date back at least five years from the filing of the Complaint.  In March 2007, Settling Defendant acquired the assets of two predecessor companies, Casie Ecology Oil Salvage, Inc. ("Casie") and Mid-Atlantic Recycling Technologies, Inc. ("MART").  Settling Defendant continued operations at the former Casie and MART facilities, respectively located at 3209 N. Mill Road, Vineland, New Jersey ("the Casie/PER Facility") and 3137 Chammings Court, Vineland, New Jersey ("the MART/PER Facility"), which are adjacent properties and are now entirely owned and/or operated by Settling Defendant (these properties are collectively defined below as "the Facility").  Settling Defendant is the successor to Casie's and MART's liabilities.

The Complaint alleges that Settling Defendant failed to comply with certain hazardous waste regulations and/or permitting requirements at the Facility.  Regarding the Casie/PER Facility, the Complaint alleges that Settling Defendant: 1) stored hazardous waste in an unauthorized tank in violation of its RCRA Permit; 2) treated hazardous waste in an unauthorized tank in violation of its RCRA Permit; and 3) shipped hazardous waste off-site to

3

third party customers without preparing a hazardous waste manifest in violation of specific hazardous waste regulations.  Regarding the MART/PER Facility, the Complaint alleges that Settling Defendant: 1) stored hazardous waste without interim status or a RCRA Permit; 2) treated hazardous waste without interim status or a RCRA Permit; and 3) shipped hazardous waste off-site without preparing a hazardous waste manifest in violation of certain hazardous waste violations.

Settling Defendant does not admit any liability for the claims alleged in  the United States' Complaint.

Settling Defendant has represented to the United States that it has voluntarily ceased hazardous waste operations at its Facility due to financial constraints, and that it has entered into an agreement, based upon a letter of intent, with a third party to sell all of its assets to that third party.  The United States has reviewed the financial information submitted by Settling Defendant to determine the extent to which Settling Defendant is financially able to pay a civil penalty to resolve the allegations in the Complaint.  Based upon its review of this financial information, the United States has determined that Settling Defendant is limited in its ability to pay a civil penalty for the violations alleged in the Complaint and is able to pay the amounts specified in Section IV (Civil Penalties).

The Parties hereto recognize, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.  This Court has jurisdiction of the subject matter and over the Parties to this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; and Section 3008 of RCRA, 42 U.S.C. § 6928. The Complaint states a claim upon which relief may be granted against Settling Defendant under Sections 3008 of RCRA, 42 U.S.C. § 6928.  Venue is proper in this Court under 28 U.S.C. § 1391(b).  Settling Defendant waives any and all objections it may have to the Court's jurisdiction, and, for purposes of this Consent Decree, including any enforcement thereof, submits to the Court's jurisdiction.

## II.  APPLICABILITY

2.  The obligations of this Consent Decree apply to and are binding upon the United States, on behalf of EPA, and upon Settling Defendant and any successors, assigns, and/or other entities or persons bound by law.

3.  No transfer of ownership or operation of the Facility or any of its assets, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Settling Defendant of its obligations to ensure that the terms of the Decree are properly implemented.  In the event that Settling Defendant liquidates, sells, transfers, leases, or assigns any asset or any interest in its Facility or its operations so that there is an additional and/or subsequent owner and/or operator of the Facility ("an Owner/Operator Transaction"), Settling Defendant shall advise the purchaser(s), transferee(s), lessee(s), or assignee(s) at least 30 days prior to such transaction, in writing, of the existence of this Consent Decree; and simultaneously provide a copy of the Consent Decree to the purchaser(s), transferee(s), lessee(s), or assignee(s).  At least twenty-five (25) days prior to completion of any Owner/Operator Transaction, Settling Defendant shall provide in writing to EPA Region 2 and New Jersey DEP at the addresses provided in Section X

(Notices), the date of the proposed Owner/Operator Transaction and the name(s) and address(es) of such purchaser(s), transferee(s), lessee(s), or assignee(s).  Any attempt to liquidate, sell, transfer, lease, or assign any asset or any interest in the Facility or its operations so that there is an additional and/or subsequent owner and/or operator of the Facility without complying with this Paragraph constitutes a violation of this Decree.

4.  Settling Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Settling Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

5.  In any action to enforce this Consent Decree, Settling Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.  DEFINITIONS

6.  Terms used in this Consent Decree that are defined in RCRA or in regulations promulgated pursuant to RCRA, including authorized state regulations, shall have the meanings assigned to them in RCRA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.  "Casie" shall mean Casie Ecology Oil Salvage, Inc.;

b.  "Casie/PER Facility" shall mean the facility owned and/or operated by Settling Defendant at 3209 N. Mill Road, Vineland, New Jersey, and that was formerly owned and/or operated by Casie;

6

c.  "Complaint" shall mean the complaint filed by the United States in this action;

d.  "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto (listed in Section XVII (Integration/Appendices));

e.  "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

f.  "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

g.  "Effective Date" shall have the definition provided in Section XI (Effective Date);

h.  "Facility" shall mean the adjacent properties formerly known as the Casie and MART facilities located, respectively, at 3209 N. Mill Road, and 3137 Chammings Court, Vineland, New Jersey, and now owned and/or operated by Settling Defendant;

i.  "Financial Information" shall mean those financial documents submitted to the United States by Settling Defendant and identified in Appendix A;

j.  "Interest" shall mean that amount of interest computed daily and compounded annually calculated at the rate specified in 28 U.S.C. § 1961 as of the date of lodging;

k.  "MART" shall mean Mid-Atlantic Recycling Technologies, Inc.;

l.  "MART/PER Facility" shall mean the facility owned and/or operated by Settling Defendant at 3137 Chammings Court, Vineland, New Jersey, and that was formerly owned and/or operated by MART;

m.  "NJDEP" shall mean the New Jersey Department of Environmental

Protection;

n.  "Paragraph" shall mean a portion of this Consent Decree identified by an

arabic numeral;

o.  "Parties" shall mean the United States and Settling Defendant;

p.  "RCRA" shall mean the Solid Waste Disposal Act as amended, 42 U.S.C. §§

6901, et seq., (commonly referred to as the Resource Conservation and Recovery Act ("RCRA"),

one of its statutory amendments);

q.  "RCRA Permit" shall mean the RCRA permit issued by NJDEP and/or EPA in

1993 to Casie authorizing it to conduct certain hazardous waste activities at the Casie/PER

Facility, including the "treatment" and "storage" of "hazardous waste" as those terms are defined

in RCRA Section 1004, 42 U.S.C. § 6903, and/or 40 C.F.R. § 260.10 (1993), as incorporated by

reference by NJAC 7:26G-4.1(a), at specified units subject to the conditions of the permit.  The

RCRA Permit was reissued in 1997 and has been modified numerous times since then.  For the

purposes of this Consent Decree, the term RCRA Permit shall include any modifications

previously made and which will be made to the Permit hereafter.  The Permit remains in effect

and Settling Defendant is subject to its terms;

r.  "Section" shall mean a portion of this Decree identified by a roman numeral;

s.  "Settling Defendant" shall mean Pure Earth Recycling, Inc. (NJ) ("PER"); and

t.  "United States" shall mean the United States of America, acting on behalf of

EPA.

IV.  <u>CIVIL PENALTIES</u>

7.  Settling Defendant shall pay a civil penalty in the amount of $750,000 which shall be paid as follows:

a.  In the event that Settling Defendant liquidates, sells, transfers, leases, or assigns any asset of, or any interest in, the Facility or its operations such that there is an additional and/or subsequent owner and/or operator of all or part of the Facility ("Owner/Operator Transaction"), upon any such Owner/Operator Transaction, payment shall simultaneously be made to the United States in the amount of $400,000.

b.  Within 30 days of any payment to Settling Defendant, or any of its representatives, of any settlement or judgment monies by the defendant Gregory W. Call (former president of Settling Defendant, Casie, and MART), or his representative(s), to resolve any claims brought against him by Settling Defendant in the matter *Pure Earth, Inc. v. Gregory W. Call,* (C.A. No. 9-04174)(E.D. Penn) ("the Call Matter"), Settling Defendant shall pay the United States the balance of any such funds up to $350,000 after the payment of any attorney's fees owed to the attorneys representing the plaintiff, PER, in that matter.

c. If at any time following entry of the Consent Decree, Settling Defendant enters bankruptcy proceedings, any outstanding or unpaid balance of the $750,000 ("the Balance"), due under the preceding two Paragraphs, is immediately due and shall be payable through the bankruptcy process.  The Parties agree, that subject to 11 U.S.C. § 502, the Balance shall be deemed an allowed claim in the bankruptcy case, without prejudice to the right of the United States to argue as to the appropriate priority of that claim.

8.  Settling Defendant shall pay the civil penalties due in the preceding Paragraph by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance

with written instructions to be provided to Settling Defendant, following lodging of the Consent

Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of New

Jersey.  At the time of payment, Settling Defendant shall send a copy of the EFT authorization

form and the EFT transaction record, together with a transmittal letter (which shall state that the

payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Pure

Earth Recycling, Inc., and shall reference the civil action number and DOJ case number 90-7-1-

09668) to the United States in accordance with Section X (Notices); by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

> U.S. Environmental Protection Agency
> Fine and Penalties
> Cincinnati Finance Center
> P.O. Box 979077
> St. Louis, MO 63197-9000

9.  Settling Defendant shall not deduct any penalties paid under this Decree pursuant to

this Section in calculating its federal income tax.

## V.  COMPLIANCE

10.  Settling Defendant shall comply with all terms and provisions of RCRA, all

applicable state and federal hazardous waste regulations, the terms of its RCRA Permit, and any

applicable closure requirements set forth in all the foregoing.

11. If Settling Defendant commences or resumes any hazardous waste activities at its

Facility, including closure, it shall:

a.  notify the United States of its hazardous waste activities pursuant to Section X

(Notices) within 24 hours of commencing such activities; and

b.  comply with the Standard Operating Procedure for Management of Oil Bearing

Hazardous Waste from Petroleum Refineries ("SOP") set forth in Appendix B of this Consent

Decree and hereby incorporated into this Decree.  The Parties may agree, in writing, to modify

the SOP.  Within 30 days of receipt of EPA's approval of the modified SOP, or as otherwise

agreed by the Parties, Settling Defendant shall comply with the modified SOP.

12.  In connection with its obligations to pay a Civil Penalty set forth in Paragraph 7(a),

Settling Defendant shall provide the United States with the following information pursuant to

Section X (Notices):

a.  a copy of each and any contract for any Owner/Operator Transaction within 48 hours

of signature of that contract by the parties to the Owner/Operator Transaction, as defined in

Paragraph 7(a);

b.  written notice of the proposed closing date for any Owner/Operator Transaction not

less than 78 hours prior to the proposed closing date.  Notice should include the name of the

prospective owner/operator and a description of the assets being sold, transferred, leased, or

assigned, and the proceeds being received in return; and

c.  an accounting of funds received and distributed as a result of any Owner/Operator

Transaction simultaneous with the closing of the Transaction.  The accounting shall be submitted

under oath by Settling Defendant's Chief Financial Officer, or another representative authorized

to make such certifications on behalf of Settling Defendant.  Follow-up certifications shall be

submitted every 30 days thereafter identifying all distributions, if any, from the proceeds of any

Owner/Operator Transaction.  Supporting documentation for each certification shall be timely

provided upon request by the United States Department of Justice and/or the United States

Environmental Protection Agency.  The certifications shall be signed under the following terms:

> I certify under penalty of law that this document [Identify Document] and all
> attachments being submitted were prepared under my direction or supervision in
> order to ensure that qualified personnel properly gathered, evaluated and prepared

this submission.  Based on my review, including my inquiry of the person or persons who prepared the submission, the information contained in this submission is to the best of my knowledge, true, accurate and complete.  I am aware that there are significant potential penalties for submitting false information.

13.  In connection with its obligations to pay a Civil Penalty set forth in Paragraph 7(b), Settling Defendant shall provide the United States with the following information pursuant to Section X (Notices):

a.  copies of any pleadings filed or correspondence sent to the court, and any orders issued by the court, in the Call Matter within 24 hours of the notation of such filing or correspondence on the docket in the Call Matter; and

b.  satisfactory documentation of any payments, through final judgment or settlement, in the Call Matter within 30 days of such payments, along with satisfactory documentation of payment of any attorneys fees to the attorneys representing the plaintiff in the Call Matter.

14.  In connection with its obligations to pay a Civil Penalty set forth in Paragraph 7(c), Settling Defendant shall provide the United States with the following information pursuant to Section X (Notices):

a.  written notice of any bankruptcy filings within 24 hours of any bankruptcy filing. The notice should include the type of bankruptcy and the location of the filing.

VI.  <u>STIPULATED PENALTIES</u>

15.  a.  Settling Defendant shall pay the United States, automatically and without further notice or demand, stipulated penalties as set forth below for the following violations of this Consent Decree:

i.     Late Payment of Civil Penalty

If Settling Defendant fails to pay any civil penalty required to be paid under Section IV (Civil Penalties) when due, Settling Defendant shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late for the first 30 Days that the penalty is late; $2,000 per Day for each Day that the payment is late for the next 30 Days that the penalty is late; and $5,000 per Day for each Day thereafter that the payment is late; and

ii.    Failure to Comply with Certain Obligations of the Decree

If Settling Defendant fails to perform or meet any specific requirement or requirements set forth in Paragraphs 3, 11, 12, 13, and 14 of this Consent Decree, Settling Defendant shall pay a stipulated penalty of $1,000 per Day per violation for each Day that Settling Defendant fails to perform or meet any specific requirement for the first 30 Days of non-compliance; $1,500 per Day per violation for each Day that Settling Defendant fails to perform or meet any specific requirement for the next 30 Days of non-compliance; and $2,000 per Day per violation for each Day thereafter of non-compliance.

b.  If Settling Defendant resumes operation at its Facility, or permanently closes its Facility, Settling Defendant shall pay the United States, automatically and without further notice or demand, a stipulated penalty of $1,000 per Day per violation for each Day that Settling Defendant fails to perform or meet any requirement referenced in Paragraph 10 for the first 30 Days of non-compliance; $1,500 per Day per violation for each Day that Settling Defendant fails to perform or meet any requirement referenced in Paragraph 10 for the next 30 Days of non-compliance; and $2,000 per Day per violation for each Day thereafter of non-compliance with any requirement referenced in Paragraph 10.

13

16.  Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.

17.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree, whether or not the United States may, in its unreviewable discretion, make a demand for such penalties.

18.  Settling Defendant shall pay any stipulated penalty owed within thirty Days of the violation, and every thirty Days thereafter until the violation is cured.

19.  The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

20.  Settling Defendant shall pay stipulated penalties owing to the United States in the manner set forth in, and with the confirmation notices required by, Paragraph 8, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

21.  If Settling Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Settling Defendant shall be liable for Interest on such penalties, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Settling Defendant's failure to pay any stipulated penalties.

22.  Settling Defendant shall not deduct any stipulated penalties paid under this Decree pursuant to this Section in calculating its federal income tax.

23.  Subject to the provisions of Section VIII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any

14

other rights, remedies, or sanctions available to the United States for Settling Defendant's violation of this Consent Decree or applicable law.

## VII.   INFORMATION COLLECTION AND RETENTION

24.   The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility, at all reasonable times, upon presentation of credentials, to:

> a.   monitor the progress of activities required under this Consent Decree;

> b.   verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

> c.   obtain samples and, upon request, splits of any samples taken by Settling Defendant or its representatives, contractors, or consultants;

> d.   obtain documentary evidence, including photographs and similar data; and

> e.   assess Settling Defendant's compliance with this Consent Decree.

25.   Subject to Paragraph 26, until five years after the termination of this Consent Decree, Settling Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Settling Defendant's performance of its obligations under this Consent Decree, including, but not limited to, such information related to payment of Civil Penalties required by Paragraphs 7, 12, 13, and 14.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Settling Defendant shall provide

copies of any documents, records, or other information required to be maintained under this Paragraph.

26.  At the conclusion of the information-retention period provided in Paragraph 25, Settling Defendant shall notify the United States at least ninety Days prior to the destruction of any documents, records, or other information subject to the requirements of Paragraph 25 and, upon request by the United States, Settling Defendant shall deliver any such documents, records, or other information to EPA.  Settling Defendant may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Settling Defendant asserts such a privilege, it shall provide the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Settling Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

27.  Settling Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Settling Defendant seeks to protect as CBI, Settling Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

28.  This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Settling Defendant to

16

maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

29.  Settling Defendant hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has:

a.  not altered, mutilated, discarded, destroyed or otherwise disposed of any records, reports, or other information relating to its potential liability regarding the Facility since notification of potential liability by the United States or the State or the filing of suit against it regarding the Facility, and that it has fully and accurately complied with any and all EPA requests for information regarding the Facility, its operations, and Settling Defendant's financial circumstances; and

b.  submitted to EPA and/or the United States Department of Justice Financial Information that fairly, accurately, and materially sets forth its current financial circumstances, and that those circumstances have not materially changed between the time the Financial Information was submitted and the time Settling Defendant signs this Consent Decree.

VIII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

30.  This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging of this Consent Decree. This resolution is conditioned upon the veracity and completeness of the Financial Information provided to the United States by Settling Defendant.  If the Financial Information is subsequently determined by the United States to be false or, in any material respect, inaccurate, Settling Defendant will be notified in writing by the United States and, in the unreviewable discretion of the United States, shall, upon receipt of such notification, forfeit all payments made pursuant to this Consent Decree and this resolution shall be null and void.  Such forfeiture shall

17

not constitute liquidated damages and shall not in any way foreclose the United States' right to pursue any other causes of action arising from Settling Defendant's false or materially inaccurate information.

31.  The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 30.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under RCRA or its implementing regulations including state authorized regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 30.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Facility, whether related to the violations addressed in this Consent Decree or otherwise.

32.  In any subsequent administrative or judicial proceeding initiated by EPA and/or the United States for injunctive relief, civil penalties, or other relief relating to the Facility or Settling Defendant's violations, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 30 of this Section.

33.  This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Settling Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations,

and permits and/or orders; and Settling Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, permits, or orders except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Settling Defendant's compliance with any aspect of this Consent Decree will result in compliance with any other provisions of federal, State, or local laws, regulations, permits, or orders.

34. This Consent Decree does not limit or affect the rights of Settling Defendant or of the United States against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against Settling Defendant, except as otherwise provided by law.

35. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

36. Notwithstanding any other provision of this Consent Decree, EPA reserves, and this Consent Decree is without prejudice to, the right to reinstitute or reopen this action, or to commence a new action seeking relief other than as provided in this Consent Decree, if the Financial Information provided by Settling Defendant, or the financial certification made by Settling Defendant in Paragraph 29, is false or inaccurate, in any material respect.

## IX. <u>COSTS</u>

37. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Settling Defendant, or in any action relating to or arising from Financial Information submitted by Settling Defendant.

19

## X.  NOTICES

38.  Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

> To the United States Department of Justice:
>
> Chief, Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> Box 7611 Ben Franklin Station
> Washington, D.C.  20044-7611
> Re: DOJ No. 90-7-1-09668
>
> To EPA:
>
> Amy R. Chester
> Assistant Regional Counsel
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway
> New York, New York 10007-1866
> Chester.Amy@epa.gov
>
> and
>
> John Wilk
> Enforcement Officer
> RCRA Compliance Branch
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway
> New York, New York 10007-1866
> Wilk.John@epa.gov
>
> To New Jersey Department of Environmental Protection:
>
> Bureau of Hazardous Waste Compliance and Enforcement
> Mail Code 09-03
> PO Box 420
> Trenton, NJ 08625-0420

<u>To Settling Defendant</u>:
Brent Kopenhaver
Pure Earth, Inc.
One Neshaminy Interplex, Suite 201
Trevose, PA 19053

Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

39.   Notices submitted pursuant to this Section shall be deemed submitted upon  mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XI.  <u>EFFECTIVE DATE</u>

40.   The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XII.  <u>RETENTION OF JURISDICTION</u>

41.   The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Section XIII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XIII.  <u>MODIFICATION</u>

42.   The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

XIV.  <u>TERMINATION</u>

43.  a.  After Settling Defendant has maintained satisfactory compliance with this Consent Decree and the RCRA Permit for a period of three years from Entry of this Consent Decree; has paid any civil penalty owed pursuant to Section IV (Civil Penalties), including any payment owed through any bankruptcy proceeding; and has paid any accrued stipulated penalties owed pursuant to Section VI (Stipulated Penalties), Settling Defendant may serve upon the United States a Request for Termination, stating that Settling Defendant has satisfied those requirements, together with all necessary supporting documentation.

b.  Following receipt by the United States of Settling Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit a joint stipulation terminating the Decree.  The United States may, in its unreviewable discretion, determine that Settling Defendant has not satisfactorily complied with all the requirements warranting termination of this Consent Decree and, in such case, the United States shall  provide Settling Defendant with the reasons for its denial ("Denial of Termination Request").  Settling Defendant may resubmit its Request for Termination after satisfying any requirements identified by the United States in its Denial of Termination Request.

XV.  <u>PUBLIC PARTICIPATION</u>

44.  This Consent Decree shall be lodged with the Court for a period of not less than thirty Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

22

improper, or inadequate.  Settling Defendant consents to entry of this Consent Decree without

further notice and  agrees not to withdraw from or oppose entry of this Consent Decree by the

Court or to challenge any provision of the Decree, unless the United States has notified Settling

Defendant in writing that it no longer supports entry of the Decree.

## XVI.  SIGNATORIES/SERVICE

45.  Each undersigned representative of Settling Defendant and the Assistant Attorney

General for the Environment and Natural Resources Division of the Department of Justice

certifies that he or she is fully authorized to enter into the terms and conditions of this Consent

Decree and to execute and legally bind the Party he or she represents to this document.

46.  This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis.

## XVII.  INTEGRATION/APPENDICES

47.  This Consent Decree and its appendices constitute the final, complete and exclusive

Consent Decree and understanding between the Parties with respect to the settlement embodied in

this Consent Decree, including Appendices A and B.  The Parties acknowledge that there are no

representations, agreements or understandings relating to the settlement other than those

expressly contained in this Consent Decree.  The following appendices are attached to and

incorporated into this Consent Decree:

> Appendix A:  Financial Information.
> Appendix B:  Standard Operating Procedure for Management of Oil
>               SRS Area - Recovered Oil Management

## XVIII.  FINAL JUDGMENT

48.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree

shall constitute a final judgment of the Court as to the United States and Settling Defendant.


Dated and entered this _____ day of _____, 2012.


_____

UNITED STATES DISTRICT JUDGE

FOR PLAINTIFF UNITED STATES OF AMERICA:

_2/13/12_
Date

ELLEN M. MAHAN
Deputy Section Chief
U.S. Department of Justice
Environmental Enforcement Section
Environment and Natural Resources Division

_2/14/12_
Date

CATHERINE ADAMS FISKE
Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
One Gateway Center
Newton, MA 02493
617 450 0444

25

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

_____     2/9/12
ERIC SCHAAF                          ————————
Regional Counsel                     Date
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007-1866


_____     2/9/12
AMY R. CHESTER                       ————————
Assistant Regional Counsel           Date
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007-1866

26

FOR THE DEFENDANT PURE EARTH RECYCLING, INC (NJ):

BRENT KOPENHAVER                                              1.27.2012
Pure Earth, Inc. (as parent company of                       Date
    Pure Earth Recycling, Inc. (NJ))
One Neshaminy Interplex, Suite 201
Trevose, PA 19053

27

APPENDIX A

Identification of financial documents submitted to the United States by Settling Defendant:

1.      Pure Earth, Inc. 2007 US Corporation Income Tax Return Form: 1120

2.      Casie Oil Salvage 2008 Corporation Business Tax Return Form: CBT-100

3.      MART 2008 Corporation Business Tax Return Form: CBT -100

4       Pure Earth, Inc. - Form 10-K (as filed) – 2008 Annual Report

5.      Rezultz 2008 Corporation Business Tax Return Form: CBT-100

6,      Pure Earth, Inc. 2008 US Corporation Income Tax Return Form: 1120

7.      Pure Earth, Inc. - Form 10-Q - September 30, 2009

8.      Pure Earth, Inc. & Subs - 2009 Corporation Business Tax Return Form: CBT-100

9.      Pure Earth, Inc 2009 US Corporation Income Tax Return Form: 1120

10.     Pure Earth, Inc. Dec. 2010 Consolidation-Net Receivables Consolidated Statement of Cash Flows

APPENDIX B

STANDARD OPERATING PROCEDURE

SRS AREA - RECOVERED OIL MANAGEMENT

Applicability:  This SOP applies to the receipt of all incoming loads destined for the SRS Area at Pure Earth Recycling (PER), the management of recovered oil at PER, and shipment of recovered oil to the PER Oil Plant also located at the same facility.  This SOP applies to both oil derived from hazardous waste (D, F, and K lists) and oil derived from non-hazardous waste. Only hazardous wastes derived from petroleum refining operations with the following codes shall be processed in the SRS equipment:  D001, D018, F037, F038, K048 to K052 inclusive, and K169 to K172 inclusive.

1)  The PER plant personnel will note on the daily scheduling board the incoming loads destined for the SRS, as well as their regulatory classification.  The details of how the load is to be managed will be communicated through regular internal scheduling protocols.

2)  All loads destined for the SRS Area will be weighed in at the scale house.  The scalehouse personnel will notify the SRS Manager via telephone when a load is being sent back to the SRS Area.  A duplicate copy of the manifest, either a hazardous waste manifest or a non-hazardous waste manifest/bill of lading, will be sent with the load from the scalehouse to the SRS Area.

3)  The SRS Manager, or his designee, will personally receive each load shipped to the SRS Area.  He will direct the truck driver on which tank, flow through equipment, or container to pump the liquid into, or if solid, where to leave the rolloff box.  The receiver must be given a copy of the manifest, on which he will mark what vessel the load was received into (e.g. into Clarification Tank, Tank 103A, left in sealed rolloff box, etc.)  This marked-up manifest will be maintained in the SRS Manager's records.

- Liquid hazardous wastes will be directed into Tank 103A.  Tank 103A is used exclusively for the transfer of liquid hazardous waste for processing in the MX-1500.

- Liquid non-hazardous waste will be directed into the Clarification Tank or Tank 103B.  The Clarification Tank and Tank 103B are used exclusively for storage and transfer, respectively, of liquid non-hazardous waste.

- Solid hazardous wastes are unloaded from their transport container (e.g. rolloff) into the pit at the front end of the MX-2000 (indirect drying process).  The MX-2000 train is used exclusively for hazardous waste.   The solids are maintained in the pit until they are loaded into the feed hopper that discharges onto the MX-2000 feed conveyor. The MX-2000 pit may not store hazardous waste for greater than 24 hours unless authorized by permit or otherwise approved by DEP.

1

For the purposes of SRS operations, liquids are defined as pumpable, flowable materials with a solids content of about 25% or less. Materials are designated as liquid or solid based on a field observation of the ability of the material to be handled as defined above.

4) The centrifuge (MX-1500) is used to process both liquid hazardous and non-hazardous waste to recover oil, but in separate runs as outlined further below. The oil recovered from the liquid waste is directed to one of two tanks, Tank 414 or Tank 416, depending upon the waste classification of the liquid waste. Tank 414 is used solely for oil recovered from hazardous waste, and Tank 416 is used solely for oil recovered from non-hazardous waste. These two tanks shall be placarded appropriately to indicate the classification of their contents at all times. The Recovered Oil Batch Logs, one for Tank 414 and one for Tank 416, will be maintained by the SRS Manager to track each batch of recovered oil stored, sampled, and transferred to its final destination.

- Liquid hazardous waste from Tank 103A is directed through the centrifuge in batches. The solids separated in the centrifuge are sent to the MX-2000 feed pit for further processing. The recovered oil is sent to Tank 414. Tank 414 is used exclusively for storage of oil recovered from hazardous waste. The centrate separated in the centrifuge is sent to the Chemical Air Flotation (CAF) unit for polishing, stored in Tank 411, and then ultimately discharged to a POTW under the RCRA wastewater exemption. The oil layer removed from the CAF unit is directed to Tank 103A for storage prior to reprocessing as a liquid hazardous waste.

- Liquid non-hazardous waste from Tank 103B or the Clarification Tank is directed through the centrifuge in batches. The solids separated in the centrifuge are sent to the MX-2000 feed pit for further processing. The recovered oil is sent to Tank 416. Tank 416 is used exclusively for storage of oil recovered from non-hazardous waste. The centrate separated in the centrifuge is sent to the CAF unit for polishing, stored in Tank 411, and then ultimately discharged to a POTW under the RCRA wastewater exemption. The oil layer from the CAF unit is directed to Tank 103A.

A decontamination procedure will be used every time the MX-1500 is switched between processing liquid hazardous waste (from Tank 103A) and liquid non-hazardous waste (from Tank 103B). At the end of a run of processing liquid hazardous waste, all solids will be removed from the centrifuge to the extent practicable and combined with the other solids from the centrifuge for disposal, the valve from Tank 103A will be closed and the MX-1500 chamber will be rinsed with 250 gallons of cleaning solution. The cleaning solution will utilize a non-hazardous commercial/industrial grade appropriate for removal pf petroleum residues, mixed with water at a standard dilution ratio, capable of rendering the equipment visually clean. The rinse volume is equivalent to a triple rinse since the nominal capacity of the chamber of the MX-1500 that holds liquid is 80 gallons. The rinse solution will be stored in a separate vessel with minimum capacity of 250 gallons located adjacent to the MX-1500. Throughout this rinse step any residual oil phase discharged from the centrifuge will be directed to Tank 414. The rinsate

2

will be handled in the same manner as the centrate from liquid hazardous batches, by separate handling and discharge to the local POTW via a NJPDES SIU Permit under the RCRA wastewater exemption.  After the rinse has ended, the centrifuge will be shut down, the valve to Tank 414 will be closed, and the valve to tank 416 will be opened.  Only then will liquid non-hazardous waste from Tank 103B be allowed to enter the MX-1500.

5) Solid hazardous solid wastes are sent to the MX-2000 for oil recovery.  In the MX-2000, the oil and water are evaporated out of the solids via indirect heating.  The processed solids are manifested and sent off-site for appropriate disposal as a hazardous waste, while retaining their listed hazardous waste status.  The vapor stream is then quenched in an air pollution control system to condense the oil and water into a liquid phase. The oil/water mixture is sent to Tank 401, which is an oil/water separator.  The separated oil collects in the center chamber of Tank 401; from here it is pumped back to Tank 103A for storage as a liquid hazardous waste, for eventual batch processing in the centrifuge.  The water phase is treated in the Dissolved Air Flotation (DAF) unit for further oil separation.  The oil collected here is also sent to Tank 103A. The wastewater fraction from the DAF unit is discharged to a POTW pursuant to the RCRA wastewater exemption.

6)  A "batch" of recovered oil consists of a maximum of one partial or full tank in either Tank 414 or 416.  In no case will oil recovered from hazardous waste be comingled from different generators and waste codes.  A batch must be sampled to determine its appropriate disposition before it is released.  The SRS Manager will determine when a sufficient batch has been accumulated to collect a sample.  Sampling will be performed according to the USEPA protocol discussed below.  Once a sample has been collected, a placard on the side of the tank will be used to indicate that the tank's contents are being analyzed, and recovered oil is not to be added to the tank or withdrawn from the tank.

The tank sampling protocol has been derived from "Compendium of ERT Waste Sampling Procedures, OSWER Directive 9360.4-07" as currently amended.  The contents being sampled in Tanks 414 and 416 are anticipated to be single phase (since they are exclusively the oil product recovered by the centrifuge).  To sample the tanks, a Coliwasa sampler will be inserted through the top manway of the tank.  Separate samples will be collected from one foot above the bottom of the tank, the mid depth of the tank, and one foot below the top of the oil surface.  The technician will visually inspect the three samples to verify that they are all a single phase, and then combine the three samples into one composite sample for subsequent laboratory analysis. In the event the three samples are heterogeneous, the tank's contents will be agitated with a portable mixer, then resampled once it has been verified that a homogenous single phase has been created.

It should be noted that Tank 414 has a drop tube that extends within one foot of the tank bottom that is utilized when withdrawing material from the tank. When withdrawing through the drop tube, the bottom one foot of oil in the tank (i.e. the tank "heel") will remain in place and the solids level will be monitored weekly to assure that it is no greater than 8 inches in thickness.

3

Records of the level monitoring will be maintained pursuant to Paragraph 18.  All removals of Tank 414 batches that have been analyzed and determined to meet the Spec Oil parameters (Section 8), and therefore are acceptable to reuse as commercial product, will be through the drop tube, so the heel of Tank 414 will remain.  (Periodically or when the level of solids reaches 8 inches, the heel of Tank 414 will be pumped out and directed into Tank 103A for reprocessing.)

7) Tank batches will be numbered sequentially, with an ID including the tank number.  For example, the first batch in Tank 416 is Batch 416-1, and the fifth batch in Tank 414 is Batch 414-5.  The sample ID for the sample collected from each batch will be "Batch ID –Sample Date".  For example:  Batch 416 - 1 – 080809.  Sample date will be in "month-date-year" format.

8)  Each batch will be analyzed for the Spec Oil parameters found at 40 CFR 279.11, according to SW-846 methods appropriate for oil analysis.  These maximum concentration limits for Spec Oil are as follows:

- Lead             100 ppm
- Arsenic        5 ppm
- Chromium     10 ppm
- Cadmium      2 ppm
- Flashpoint     Min 100∘ F
- TOx              1000 ppm  (to rebut the hazardous waste presumption)

In no case, may the concentration of total halogens exceed 4,000 ppm.  Used oil with a halogen content above 1,000 but equal to or less than 4,000 ppm must be presumed to be a hazardous waste under the rebuttable presumption provided under 40 CFR 279.10(b)1. In addition, the PCB content of the oil must be less than 50 ppm.

9)  Oil recovered from hazardous waste (which is stored in Tank 414) must pass the spec oil limits above before it can be transferred from Tank 414 to PER's Class D Oil Recycling Facility.  Such transfer will only be performed by removing Tank 414's contents through the drop tube, so as not to withdraw the bottom one foot of tank contents.  Oil recovered from non hazardous waste (which is stored in Tank 416) ***does not*** need to meet the spec oil limits above to be transferred to PER's Class D Oil Recycling Facility. (However, this oil must ultimately meet the spec oil limits, including  less than 2 ppm PCB to be exempt from the regulations at 40 CFR 761.20(e) if it is sold for burning, before it is shipped off-site from PER's Class D Oil Recycling Facility into general commerce.  If the PCB content is not less than 2 ppm, the Facility must comply with the standards for burning used oil containing PCBs set forth at 40 CFR 761.20(e)).

10)  Each set of analytical results will be reviewed by the SRS Manager and the Oil Plant Manager.  If the results pass the spec oil limits above, then the results sheet will be marked "Approved for Shipment to PER Class D Facility" and initialed by both the SRS Manager and the Oil Plant Manager.  A copy of this initialed paperwork will be maintained by both individuals, as well as kept with the manifest used to ship the load between the two facilities.

4

11)  If the analytical results fail the spec oil limits for a Batch of oil recovered from hazardous waste, then that batch must not be shipped to the PER Class D facility.  The analytical results sheet will be marked "Rejected for Shipment to PER Class D Facility" and initialed by the SRS Manager.  A copy of this paperwork will be kept with the SRS Manger.  When Tank 414 is found to contain a failing Batch, it will be emptied and its contents pumped back into Tank 103A for reprocessing in the MX-1500 as a hazardous waste.  No other oil will be added to Tank 414 until the failed Batch has been removed and the tank has been triple rinsed with a cleaning solution appropriate for removing petroleum residues.  The decontamination rinsate will be transferred to Tank 103A for reprocessing.  If Tank 414 receives a hazardous waste, it will be subject to RCRA closure requirements when the tank is permanently taken out of this service.

12)  If the analytical results fail the spec oil limits for a Batch of oil recovered from non hazardous waste, then that batch may be shipped to the PER Class D Facility, but this approval is at the discretion of the Oil Plant Manager.  Depending on the Oil Plant Manager's decision, the analytical results shall either be marked and initialed "Rejected" or "Approved" as outlined above.   A rejected batch will be pumped back into either the Clarification Tank or Tank 103B for eventual reprocessing in the centrifuge.

13) If a batch of oil recovered from hazardous waste is rejected, then the SRS Manager has the following options, either:

- Empty the entire batch into Tank 103A (liquid hazardous waste storage tank), and indicate this transfer on the Batch Tracking Log.  This oil will eventually be reprocessed in the centrifuge in a "hazardous" batch, and then stored back into Tank 414 after processing for subsequent sampling.

- Dispose of the batch at an alternative facility approved to manage oil derived from the same hazardous waste type/RCRA code (i.e. F037, F038, K048 to K052 inclusive, K169 to K172 inclusive, and D018) and noted in the Batch Tracking Log.

14)  If a batch passes, and is accepted by PER's Class D Facility, then it must be shipped under appropriate non-hazardous shipping papers as used oil.  The shipping papers shall reflect the Batch ID #.  Copies of the completed shipping papers are to be kept by both the SRS Manager and the Oil Plant Manager.

15)  Tanks storing recovered oil must have placards on them indicating their contents and status (oil recovered from hazardous or non-hazardous waste; currently filling, under analysis, or emptying, etc.).  Contents may not be added to the tanks when they are under analysis, or are being emptied.  Tanks must be appropriately labeled.

16) Final analysis that documents that a batch meets the spec oil requirements above must be performed at a New Jersey Certified Laboratory pursuant N.J.A.C. 7:18-2.6. All reported analytical detection limits must be less than the corresponding regulatory action level. The in-house PER lab is a New Jersey Certified laboratory for the spec parameters.  All analytical

results are to be stored electronically in the appropriate folder on the computer network by the SRS Manager.  (They are to reflect the batch number accordingly for ease of identification).

17)  A copy of the Batch Log Sheet will be submitted for EPA review within 30 days prior to the facility restarting its operations.  The Batch Log Sheet must include all the information indicated in Paragraph 4 above.  The approved Batch Log Sheet is automatically incorporated into this SOP.

18)  Records for the following items shall be maintained for a minimum period of five years, unless a shorter duration is required by a RCRA Subtitle C Permit:  quantities and types of incoming and outgoing hazardous waste, quantities of oil reclaimed from hazardous waste, all sampling data and analyses, log sheets, tank inspections, and the amount of condensate from the indirect drying unit (specifically, the amount of oil fraction returned to Tank 103A from the indirect dryer and the date of such return) .

19)  A Flow Chart of this SOP will be submitted for EPA review within 30 days prior to the facility restarting its operations.  The approved Flow Chart is automatically incorporated into this SOP.